Clyde WHISMAN, Appellant,

v.

Catherine WHISMAN, Appellee.

Court of Appeals of Kentucky.

March 11, 1966.

Rehearing Denied May 6, 1966.

Julian R. Gabbard, Owingsville, for appellant.

William H. Priest, Mt. Sterling, for appellee.

DAVIS, Commissioner.

The vexing question presented in this appeal is the matter of child custody. Clyde Whisman, appellant, and Catherine Whisman, appellee, were formerly husband and wife. They were divorced in 1957. By the 1957 divorce judgment the general cus-

tody of their only son, then about two years old, was granted to the appellee, mother of the child. In July, 1965, the present appellant, father of the child, filed a motion to modify the divorce judgment so as to grant him custody of the child. After hearing the parties and their witnesses, the trial judge overruled the motion, hence this appeal.

 We must view the controversy in light of the accepted principles applicable: (1) the prime consideration is the welfare of the child; (2) usually the mother is regarded as the best suited parent to have custody of children of tender years, and (3) this court will not disturb the factual findings of the trial judge unless they are regarded as clearly erroneous. Cf. Hinton v. Hinton, Ky., 377 S.W.2d 888; CR 52.01.

Just after the 1957 divorce the wife returned to her native state, Ohio. She has lived there since; she has not remarried. However, she had borne two illegitimate children, a girl and boy, two years old and seven months old, respectively, at the time of the hearing in July, 1965. Mrs. Whisman, appellee, testified that she has terminated her relationship with the man she named as the father of these two children. She said that she had never sought to require him to contribute to their support, although she told of his having supplied food and other necessities from time to time. During the time that the relationship existed between her and the extra-marital father the latter frequently visited in her home, in the presence of the child whose custody is involved here. Appellee and her suitor "took him (the child in question) places with us all the time."

When appellee was asked whether any other man called at her home she responded:

"A. Not until here lately, I've been going with this other guy."

When questioned further about her relationship with the new "guy" she replied:

"A. Yes, he comes to the house.

"Q. Does he contribute to any of the food that he might eat?

"A. Yes, he does.

"Q. And when does he buy that food?

"A. Well, every weekend when I go to the grocery.

"Q. Every weekend?

"A. Yes, he eats there.

"Q. And he's not the father of any of your children?

"A. No, he isn't but he is going to be."

The appellee frankly testified that she did not regard her conduct as adversely affecting her legitimate son. So far as may be gleaned from her evidence, appellee harbors no thought of changing her ways. Indeed, the conclusion is inescapable that appellee sees nothing irregular in her mothering two illegitimate children and looking forward to maintaining her productivity with a new found prospective father.

Appellee has had regular employment outside her home since the divorce. The son of these parties has been cared for, during the daytime at least, by various baby-sitters. The record reflects that appellee resides in a four-room apartment, comprised of two bedrooms, a kitchen and living room. At the time of the hearing the following persons also lived in these quarters, as testified by appellee:

"A. At the present, my sister and my sister-in-law and her two little kids are living there because they have no other place to stay; she baby sits for me at the present time."

These four individuals, together with appellee and her own three children, constitute a regular contingent of eight people in the four rooms.

It must be observed that the boy in question has done well so far in his school and other worthwhile activities. He has spent some time with his father on the latter's

365 acre farm in Bath County. The physical facilities at the father's home are not so congested as at his mother's. The father has remarried and has one other child by the second marriage. His present wife testified that she has no outside employment, that she knows and gets along well with the child in question, and would welcome him into the home.

■ As recently as Yelton v. Yelton, Ky., 395 S.W.2d 590, this court remarked that the ideal situation is unattainable in a case of this type. In *Yelton* the chancellor modified a custody order by changing custody to the father from the mother. We affirmed that decision, and pointed out that the father's home presented an infinitely better prospect for the welfare of the children than did the mother's. In *Yelton* there was no showing or claim that the mother had borne children out of wedlock—in fact, she had remarried, but her second husband was in prison. We are convinced that the facts in the present case impel the conclusion that the welfare of the ten year old boy will be better served by granting the general custody of him to the appellant,

his father. It is our view that the findings of the trial judge to the contrary are clearly erroneous, and that leaving custody with the appellee was an abuse of discretion. As noted in Nicol v. Conlan, 385 S.W.2d 779, 782, the ten year old boy is not a child of "tender years."

■ We note that appellant seeks reversal of that portion of the order which adjudged him to be $170 in arrears on maintenance payments. Without detailing the evidence, we observe that our review of it does not persuade us that the findings of the lower court on the point are clearly erroneous. Hence, we will not disturb that portion of the judgment.

The judgment is reversed as respects the matter of custody, with directions to enter a new judgment awarding general custody of the son of these parties to the appellant, with appropriate provisions relating to reasonable visitation rights for the appellee; such adjustment of maintenance allowances shall be made as will be appropriate in the changed custody situation. As the judgment relates to the $170 delinquency in maintenance payments, it is affirmed.